[Cite as *Norman v. Ohio Dept. of Transp.*, 2011-Ohio-3153.]

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

JAMES W. NORMAN

   Plaintiff

   v.

OHIO DEPARTMENT OF TRANSPORTATION

   Defendant
   Case No. 2009-04548

Judge Clark B. Weaver Sr.

DECISION

{¶ 1}  Plaintiff brought this action against defendant, the Ohio Department of Transportation (ODOT), alleging negligence.  The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶ 2}  This case arises out of a motor vehicle accident that occurred on June 7, 2007, at approximately 12:40 p.m., in Tuscarawas County, Ohio.  At the time, plaintiff was operating a motorcycle southbound on State Route 93 (SR 93), en route from Barberton to West Lafayette.  It was a clear, sunny day.  In the area in which plaintiff was traveling, SR 93 is a winding, hilly, two-lane road that passes through a rural farming region; the posted speed limit was 55 miles per hour (mph).

{¶ 3}  Also at the time, ODOT was conducting a "spot berming" operation in an approximately seven-tenths of a mile stretch of SR 93's southbound lane.  The operation involved dumping aggregate material onto the roadway and grading it into the shoulder, after which a truck with a front-mounted rotary sweeper (sweeper truck)

cleared any remaining debris off the road. The work progressed from area to area along the roadway as needed.

{¶ 4} In order to perform its work, ODOT had in place a temporary traffic control (TTC) pattern that included orange warning signs on the approach at either end of the work zone alerting drivers first of "road work ahead," then "one lane road ahead" and, lastly, a sign bearing the symbol for a flagger. The flaggers were then located at the north and south ends of the work zone, approximately three-tenths of a mile from where the work was being performed. Each flagger was equipped with a paddle sign bearing the word "stop" on one side and "slow" on the other. By communicating via radio, the flaggers alternately stopped traffic on their end of the work zone and, when cleared to do so by the other flagger, would turn their paddle to the "slow" sign and direct motorists to proceed into the open northbound lane.

{¶ 5} Plaintiff testified that he did not see any of the three warning signs on the approach to the work zone. He related that the first indication that he had of any change in the normal traffic pattern was when he observed a flagger standing in the roadway. He stated that the flagger waved either his hand or a flag in an up and down motion, which he interpreted as a signal to slow down. Plaintiff then proceeded past the flagger in the north bound lane and slowed down as instructed, but he returned to the southbound lane at some point. He testified that he was traveling at approximately 30 mph when he crested a blind hill and encountered a patch of loose gravel that was being cleared by the sweeper truck. Plaintiff maintains that the sweeper truck was backing up when he crested the hill and that, although he braked and swerved in an attempt to avoid a collision, he was unable to do so. Plaintiff's motorcycle struck the right, rear of the sweeper truck before crashing into a ditch off the side of the roadway. He sustained extensive physical injuries to the left side of his body.

{¶ 6} Plaintiff contends that ODOT was negligent in the implementation of its TTC pattern and that its sweeper truck driver was negligent in backing his vehicle up a blind hill. Defendant denies liability and contends that plaintiff's own negligence was the sole proximate cause of his injuries.

{¶ 7} In order to prevail upon a claim of negligence, plaintiff must prove by a preponderance of the evidence that defendant owed him a duty, that defendant's acts or

omissions resulted in a breach of that duty, and that the breach proximately caused his injuries. *Armstrong v. Best Buy Company, Inc.*, 99 Ohio St.3d 79, 81, 2003-Ohio-2573, citing *Menifee v. Ohio Welding Products, Inc.* (1984), 15 Ohio St.3d 75, 77.

{¶ 8} ODOT is subject to a general duty to exercise ordinary, reasonable care in maintaining state highways. *White v. Ohio Dept. of Transp.* (1990), 56 Ohio St.3d 39, 42. "The scope of ODOT's duty to ensure the safety of state highways is more particularly defined by the Ohio Manual of Uniform Traffic Control Devices [OMUTCD], which mandates certain minimum safety measures." *State Farm Auto. Ins. Co. v. Ohio Dept. of Transp.* (June 8, 1999), Franklin App. Nos. 98AP-936, 98AP-1028, 98AP-960, 98AP-1536, 98AP-976, 99AP-48. "[N]ot all portions of the manual are mandatory, thereby leaving some areas within the discretion and engineering judgment of [defendant.]" *Leskovac v. Ohio Dept. of Transp.* (1990), 71 Ohio App.3d 22, 27, citing *Perkins v. Ohio Dept. of Transp.* (1989), 65 Ohio App.3d 487, 491.

{¶ 9} In support of his claims, plaintiff produced evidence that, when his counsel contacted ODOT regarding what traffic control measures had been in place on the date of the accident, he was provided with a copy of the OMUTCD's 6C-3 "One-Lane, Two-Way Traffic Taper" specifications. (Plaintiff's Exhibit 7.) Plaintiff also produced evidence that, when his counsel again contacted ODOT requesting clarification as to whether the 6C-3 layout was an example of an appropriate plan or whether it was the actual plan that had been in place at the time, ODOT responded that the 6C-3 was, in fact, the TTC plan that had been in place. (Plaintiff's Exhibit 9.) The 6C-3 consists of all of the above-described warning signs and use of flaggers, but also includes a series of "channelizing" traffic cones placed first in a taper formation from the right berm of the roadway to the center line, then continuing along the center line up to and past the work activity, and finally tapering off to the right berm at the end of the work zone.

{¶ 10} In further support of his claims, plaintiff relies upon ODOT's "Guidelines for Traffic Control in Work Zones."[1] The handbook contains a matrix diagram of "Suggested Temporary Traffic Control For Work Activities" that provides two options for

---

[1] The handbook summarizes certain guidelines set forth in the OMUTCD. The introduction specifies that "[t]his information is intended to provide the principles of proper work zone traffic control, but is not a standard. Part 6 of the OMUTCD contains the standards for work zone traffic control." (Defendant's Exhibit A, Page 1.)

establishing a TTC layout in a spot berming operation: a TA-10 or a TA-17. (Defendant's Exhibit A.) The TA-10 option reflects the 6C-3 pattern. The TA-17 option utilizes a "shadow" vehicle in lieu of cones and flaggers. A shadow vehicle is equipped with strobe and flashing lights and may also include a truck-bed mounted, rear-facing arrow sign or other warning message to provide additional traffic direction. A shadow truck closely follows the work vehicles and serves to alert drivers of the exact work activity area.

{¶ 11} Notwithstanding the information plaintiff received from ODOT, there is no question that channelizing cones were not used in the TTC layout at the time of the accident. There was testimony that a shadow vehicle, albeit without an additional truck-mounted warning sign, was parked at the crest of the hill north of the sweeper truck. The truck appears in several of the photographs which were taken by the Ohio State Highway Patrol (OSHP) trooper who responded to the scene. The evidence is conflicting as to whether the truck was in that location when the accident occurred. Based upon the information provided by ODOT and the OMUTCD guidebook, plaintiff argues that ODOT failed to comply with its own standards in providing a safe and effective TTC in the area where plaintiff's accident occurred.

{¶ 12} Arthur Fondriest, ODOT's project foreman on the date of the incident, chose and put into place the TTC layout for the work zone. According to Fondriest, the TTC that he chose was the same type that he had used for spot berming work for the 29 years that he was employed by ODOT. He testified that traffic cones are not appropriate for a "mobile operation" such as spot berming because the TTC must be repeatedly set up and taken down as the work progresses. He explained that the goal of a TTC layout is to protect not only motorists but also the ODOT work crew, and that repeated placement and movement of cones is both hazardous for workers as well as a distraction for motorists. According to Fondriest, cones interfere with the operation of both the grader and sweeper trucks in a berming operation. With respect to the sweeper truck, Fondriest testified that it typically requires more than one pass over the roadway to clear all of the debris and that, in order to make a second pass, the truck

must make a "U" turn into the opposite lane, drive back to an appropriate starting point, make a "U" turn back into the work lane, and then begin sweeping again.

{¶ 13} Fondriest insisted that the 6C-3 layout is the pattern used for "ditching" or tree trimming where the worksite remains in place for longer periods and does not involve vehicles moving in and out of the work lane. Fondriest further noted that the TTC that he used included everything in the 6C-3 layout except the cones, but that he had added a shadow vehicle. Fondriest testified that it was his truck that was shown in the OSHP photographs, and that he had parked it in the southbound lane at the crest of the blind hill, with its strobe lights activated, behind the area where the sweeper truck was operating.

{¶ 14} Timothy Tuttle, plaintiff's accident reconstruction expert, calculated that plaintiff was traveling at approximately 29 to 34 mph, in the southbound lane, when his motorcycle began to skid. He opined that it was "impossible" that Fondriest's truck was parked at the crest of the hill at the time of the accident. His analysis of the physical evidence, including the skid marks shown in the OSHP photographs, was that plaintiff would not have had sufficient time to travel from the southbound lane, around the shadow vehicle, and back into the southbound lane before the point where he encountered the gravel, began to skid, and was unable to avoid the collision.

{¶ 15} Carmen Daecher, plaintiff's traffic engineering expert, testified that pursuant to Section 6G.01 of the OMUTCD (Plaintiff's Exhibit 31), TTC patterns are arranged according to four criteria: the duration of the work involved, the location, the type of work, and the type of roadway. Daecher characterized the duration of the work as "short-term stationary,"[2] the location as "within the traveled roadway," and the highway type as "having no significant sight distance." With those considerations in mind for a berming operation, Daecher opined that a TA-10/6C-3 layout with traffic cones was required. In his view, those same characteristics, when applied to a mobile berming operation, would have required a TA-17 layout; however, he did not believe that the required shadow vehicle was present when the accident occurred. He testified that the OMUTCD sets forth the "minimal desirable standards" and that components of

---

[2]Section 6G.02 of the OMUTCD defines short-term stationary work as "daytime work that occupies a location for more than 1 hour within a single daylight period." A mobile operation is defined as "work that moves intermittently or continuously."

the suggested TTC's can be modified by adding safety components, but not by taking any components away. It was his opinion that ODOT did not have either a proper TA-10 or TA-17 layout in place at the time.

{¶ 16} In response to plaintiff's evidence, defendant presented the testimony of Doug Dillon, a traffic engineer and Roadway Service Manager for ODOT's District 11, where the accident occurred, and that of Dale Meyer, an accident reconstruction expert.

{¶ 17} Dillon testified that there are 3,500 miles of roadway in District 11 and that spot berming is a routine operation that is performed each year on the 7,000 miles of road berm in the district. He related that it was he who had provided the 6C-3 diagram in response to plaintiff's request for information. Dillon testified that he based his response upon information that he received from the county transportation manager and a review of the work logs for the date in question. He stated that he selected the TTC that he thought was appropriate, but that he was not at the site at the time that the accident occurred. Dillon insisted that the 6C-3 was the plan in use at the time, with the exception of the channelizing cones. He noted that, according to the OMUTCD, such cones are optional for a moving operation. Dillon was adamant that, based upon his engineering and ODOT work experience, spot berming is considered a moving operation. He explained that the OMUTCD by its own language sets forth "typical" layouts that experienced road crews are expected to modify for the particular circumstances in order to create the best possible safety conditions for both themselves and the public. He concluded that the TTC in use on the date of the accident complied with all OMUTCD standards.

{¶ 18} Meyer testified regarding the cause of the accident and whether the TTC layout was a factor. It was his opinion that the TTC was appropriate, assuming that it included Fondriest's truck as a shadow vehicle at the crest of the hill. Based upon his investigation, Meyer opined that the truck was located at a sufficient distance north of the hill crest for a motorcyclist to drive past it and then back into the southbound lane before encountering the loose gravel and beginning to skid. Meyer further testified that, in his view, the cause of the accident was a "clear case" of plaintiff's failure to maintain an assured clear distance ahead. He concluded that if plaintiff had paid reasonable attention to the warning signs and the flagger's instruction on the approach to the area,

plaintiff would have been alert to the presence of a work zone and had sufficient time and distance to avoid the accident.

{¶ 19} Upon review of the testimony and other evidence presented, the court finds as follows.

{¶ 20} The weight of the evidence establishes that in order to be in compliance with the OMUTCD standards, the TTC in place at the work zone had to include either channelizing cones or a shadow vehicle. Although the manual does not state that the use of either is mandatory, based upon the duration of the work, its location, the nature of the operation, and the limited sight-distance that existed in the area, reasonable discretion and judgment dictate that one or the other be in place. Dillon acknowledged as much when he twice sent the 6C-3 specifications to plaintiff, as did Fondriest when he testified that he had parked his ODOT truck at the crest of the hill in lieu of using traffic cones. Because it is evident that there were no channelizing cones in place, the question becomes whether the shadow vehicle was present at the time of the accident. The court is convinced that it was not. Fondriest testified that he was at the bottom of the hill talking to other workers when the accident occurred. He related that he was in that location because the work in the area was complete, except for the sweeping, and that he was discussing moving the work zone to the next location. While the OSHP photographs show Fondriest's truck at the crest of the hill, the trooper did not arrive at the scene until approximately 20 minutes after the accident occurred and it is reasonable to assume that the photographs were not taken until some time later. The court finds that Fondriest was a credible and candid witness; however, the court is persuaded that he simply failed to recall whether he walked or drove his truck down the hill to talk to the other workers. The court finds that moving the truck away from the work activity before it was complete constitutes a breach of the duty of care owed to plaintiff and was a proximate cause of the accident.

{¶ 21} With respect to the issue whether the sweeper truck was backing up, and thereby reduced or eliminated plaintiff's ability to react to and avoid the accident, the court finds that the evidence fails to establish that such was the case. Both Fondriest and Sherman Jones, who was operating the sweeper truck, testified quite credibly regarding the method for turning the truck in order to make a second or third pass over

the debris remaining on the roadway. Fondriest and Jones recalled clearly that Jones was driving forward at the time of the accident. There was simply no persuasive evidence that the sweeper truck was backing up for any reason prior to the accident. Accordingly, the court concludes that the sweeper truck's movement was not a proximate cause of the accident.

{¶ 22} In short, the court finds that ODOT's negligence in moving the shadow vehicle, combined with plaintiff's own negligence to produce plaintiff's injury.[3] As such, Ohio's comparative fault statute, R.C. 2315.33,[4] is applicable.

{¶ 23} The common law of Ohio imposes a duty of reasonable care upon motorists that includes the responsibility to observe the environment in which one is driving. See, e.g., *Hubner v. Sigall* (1988), 47 Ohio App.3d 15, 17. The evidence in this case is clear that plaintiff did not observe any of the three warning signs on the approach to the work zone, or that the flagger used a paddle sign as opposed to a cloth flag or the hand signals that plaintiff recalled. Further, plaintiff could not even recall whether he was directed to proceed into the northbound lane; he testified that he thought that the flagger was there only to slow down traffic. The court does not doubt that plaintiff slowed his speed in response to the flagger's direction, however, R.C. 4511.21 provides:

---

[3] In reaching this determination, the court has not considered the testimony of Clantz Liggett, the flagger who was on duty in the southbound lane at the time of the accident. Liggett testified that shortly before the accident he had stopped a line of traffic, including a semi-tractor trailer and eight or nine cars, when a motorcyclist sped out from the line and drove past him before stopping and looking back for direction. Liggett stated that he had been cleared by the other flagger to release his line of traffic, so he motioned for the motorcyclist to proceed, then released the other vehicles. However, none of the witnesses who were present at the accident scene recalled seeing a line off traffic, particularly a semi-tractor trailer, travel through the area after the accident. Further, Liggett recalled that the motorcyclist who sped past him was wearing a helmet; plaintiff was not. The court concludes that the totality of the evidence establishes that plaintiff was not the motorcyclist that Liggett identified.

[4] R.C. 2315.33 provides:

"The contributory fault of a person does not bar the person as plaintiff from recovering damages that have directly and proximately resulted from the tortious conduct of one or more other persons, if the contributory fault of the plaintiff was not greater than the combined tortious conduct of all other persons from whom the plaintiff seeks recovery * * *."

{¶ 24} "(A) No person shall operate a motor vehicle * * * at a speed greater or less than is reasonable or proper, having due regard to the traffic, surface, and width of the street or highway *and any other conditions,* and no person shall drive any motor vehicle * * * upon any street or highway at a greater speed than will permit the person to bring it to a stop within the assured clear distance ahead." (Emphasis added.)

{¶ 25} In *State v. Dehnke* (1974)**,** 40 Ohio App.2d 194, the court explained that "[i]n considering the wording of the statute, we find that the single basic requirement is that the speed be reasonable under the circumstances existing. The statutory limits for various types of roads or highways furnishes a two pronged presumption affecting the presentation of evidence. A speed in excess of the statutory limit is a prima facie unreasonable speed; a speed at or below the statutory limit is a prima facie reasonable speed. But *the ultimate criterion is that the speed be reasonable considering the conditions then existing.*" Id. at 195-196. (Emphasis added.)

{¶ 26} In this case, plaintiff testified that he had previously traveled SR 93 on numerous occasions and was familiar with its terrain. He acknowledged that the area was in "Amish country" and that it was important to be alert for buggies and bicycles. He also acknowledged that he observed a flagger in the roadway and that he was directed to slow down. The court finds that, given plaintiff's knowledge and familiarity with the surroundings, his lack of attentiveness and his speed through the area was unreasonable for the conditions then existing. The court finds that the degree of fault attributable to plaintiff is 75 percent.

{¶ 27} For the foregoing reasons, the court finds that although defendant was negligent in failing to maintain a safe and efficient TTC, any negligence on its part is outweighed by that of plaintiff. Judgment shall therefore be entered in favor of defendant.

Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

JAMES W. NORMAN

     Plaintiff

     v.

OHIO DEPARTMENT OF TRANSPORTATION

     Defendant
     Case No. 2009-04548

Judge Clark B. Weaver Sr.

<u>JUDGMENT ENTRY</u>

     This case was tried to the court on the issue of liability. The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of defendant. Court costs are assessed against plaintiff. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

                               _____
                               CLARK B. WEAVER SR.
                               Judge

cc:

Christopher P. Conomy            J. Thomas Henretta
Assistant Attorney General         400 Key Building
150 East Gay Street, 18th Floor     159 South Main Street
Columbus, Ohio 43215-3130       Akron, Ohio 44308

Mark C. Willis
Todd L. Willis
670 West Market Street
Akron, Ohio 44303-1414

LH/cmd/Filed June 9, 2011/To S.C. reporter June 22, 2011